```
Curtis Porterfield (SBN: 101896)
curtis.porterfield@novakdruce.com
NOVAK DRUCE CONNOLLY BOVE + QUIGG
333 Grand Ave., Suite 2300
Los Angeles, CA 90071
(213) 787-2500

Wes Klimczak (SBN: 294314)
wes.klimczak@novakdruce.com
NOVAK DRUCE CONNOLLY BOVE + QUIGG
21771 Stevens Creek Blvd., Suite 1
Cupertino, CA 95014
(408) 414-7330

Attorneys for Plaintiff Michael Malinin
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHAEL MALININ, an individual,**<br><br>Plaintiff,<br><br>v.<br><br>**JOHN RZEZNIK, an individual; ROBERT TAKAC, an individual.**<br><br>Defendants. | Case No. 2:14-cv-08860<br><br>**COMPLAINT FOR:**<br><br>1. **Wrongful Dissociation from Partnership;**<br>2. **Judicial Determination of Buyout Price;**<br>3. **Breach of Fiduciary Duties; and**<br>4. **Declaratory Relief.**<br><br>**JURY TRIAL DEMANDED** |

Michael Malinin ("Malinin") hereby alleges for his complaint against defendants John Rzeznik ("Rzeznik") and Robert Takac ("Takac") (collectively

- 1 -

referred to as "Defendants") on personal knowledge as to his own activities and on information and belief as to the activities of others, as follows:

## NATURE OF THIS ACTION

Plaintiff Malinin has worked tirelessly as one of three members of the rock band the Goo Goo Dolls (the "GGD") for the past nineteen (19) years to help build the band from a fledgling enterprise playing to crowds mostly numbering less than 100 people for $1,000 per night, to its current success - now playing to crowds of thousands and generating substantial album and merchandising sales. In addition to performing as the band's drummer on every album and on every tour, Malinin paid one third (1/3) of the band's working expenses and shared in one third (1/3) of the band's profits.

In December 2013, during the tour of the current album, Malinin left the tour on a long planned paternity leave to be with his wife for the birth of their twins. Malinin was to rejoin the tour starting with the New Year's Eve show in Los Angeles. Just days before the Los Angeles show, Malinin received a call from the band's manager, Pat Magnarella, telling him that the band's leader, John Rzeznik, had decided to terminate Malinin and he should not plan to play with the band at any further tour dates. Magnarella also told Malinin that he would receive no severance of any kind and no payment for his 19 years' contribution to the band. When Malinin asked about his termination, the only reason ever given for his mid-tour dismissal came from the GGD's lawyers who stated "terminable upon notice, without cause". Malinin's share of the band's profits from touring, merchandise and otherwise ceased with the December shows. Left with newborn twins, no income and no warning or notice time in which to plan for sudden unemployment, Malinin and his family were devastated and their finances decimated. Malinin was forced to sell his home and move from California to a more affordable location in Franklin, Tennessee, near Nashville, where he hoped to get work. Malinin is suing

his former bandmates for his share of the remaining tour proceeds and other profits and a buyout payment commensurate with his contribution to helping build and fund the band's considerable success over 19 years. Malinin also seeks punitive damages for his callous wrongful termination which was clearly timed to intentionally inflict injury upon him and his new family at the worst possible time. Punitive damages are appropriate to punish such sociopathic conduct and ensure that there is no reward for hatred and despicable conduct.

## PARTIES

1. Malinin, an individual, is currently a resident of Franklin, Tennessee. Malinin was formerly the drummer for the GGD for nineteen (19) years from January of 1995 until his termination from the GGD in late December of 2013. In his 19 years with the GGD, Malinin played on all five studio albums with the GGD and performed every tour.

2. Rzeznik, an individual, currently resides in Los Angeles, California. Rzeznik is currently a member of the GGD, and is the GGD's guitarist and vocalist.

3. Takac, an individual, currently resides in Buffalo, New York. Takac is currently a member of the GGD, and is the GGD's bassist and vocalist.

4. The GGD's principal place of business is in Santa Monica, California. During Malinin's tenure as the band's drummer, Malinin, Rzeznik and Takac performed on all albums, on tour, and appeared at events as the GGD.

## JURISDICTION AND VENUE

5. The Court has personal jurisdiction over both Rzeznik and Takac because both have had continuous and systematic contacts with the State of California and as members of the GGD.

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Malinin is currently a resident of the State of Tennessee,

1 defendant Rzeznik is a resident of the State of California, and Takac is a resident of the State of New York. Complete diversity exists between the Plaintiff and all Defendants. The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

7. Venue for this action is proper under 28 U.S.C. § 1391(b) in the United States District Court for the Central District of California because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims alleged herein occurred.

## FACTUAL BACKGROUND

8. The GGD is a rock band that was formed in 1986 in Buffalo, New York by guitarist and vocalist Rzeznik, bassist and vocalist Takac, and drummer George Tutuska ("Tutuska").

9. When Tutuska was fired from the GGD at the end of 1994, Malinin became the GGD's drummer in January of 1995.

10. At all times thereafter, Malinin was the GGD's drummer until he was abruptly and unlawfully terminated from the GGD in December of 2013.

11. Tutuska left the GGD at the conclusion of recording the *Boy Named Goo* album and before the GGD went on tour to promote the album. Malinin did not play on the *Boy Named Goo* album, but was hired to tour with the GGD to promote the album.

12. Malinin signed a contract upon joining the band's tour in January of 1995 (the "January 1995 Contract") setting forth the terms of his employment for the tour. According to the terms of the January 1995 Contract, Malinin was employed as a contract drummer solely for the tour to promote the *Boy Named Goo* album, and his employment ended at the conclusion of that tour and prior to commencement of the recording of the subsequent album.

13. When the January 1995 Contract expired at the conclusion of the GGD's tour, the Defendants asked Malinin to become the band's permanent drummer. Except solely with respect to the allocation of royalties on the next album, *Dizzy Up The Girl*, the parties did not enter into another written contract regarding Malinin's services going forward.

14. As one of the members of the GGD, Malinin came to receive the same weekly advance as the other two members while the band was touring, share in one-third (1/3) of the touring profits, one-third (1/3) of all merchandise revenue, and one-third (1/3) of any and all residual recording advance payments, plus a royalty on all recordings on which he played. Malinin, Rzeznik and Takac were also each responsible for the payment of one-third (1/3) of all recording expenses and touring expenses. Malinin also participated in the GGD's pension program along with Rzeznik and Takac. At all times that Malinin was a member of the GGD, his compensation consisted solely of his percentage of the GGD's profits. Just as Rzeznik and Takac, Malinin was never paid a salary and when the band was not touring, recording or otherwise performing, Malinin had no GGD income except his periodic royalty payments.

15. At all times after Malinin joined the GGD, Malinin, Rzeznik and Takac represented themselves as the three members of the GGD. The three members were pictured together in all promotional materials, album art, merchandise and photo opportunities. The three members jointly did interviews with the press, made publicity appearances, and performed for charities and private events as the GGD. All three members, including Malinin, have their handprints in cement in front of the Guitar Center on Sunset Boulevard in Hollywood, California as the GGD. When the band was nominated for a Grammy, Malinin, Rzeznik and Takac were each recognized with a certificate. It was clear at all times that Malinin was a member of the GGD, just as Rzeznik and Takac were members.

16. Although additional musicians were hired from time to time to play on recordings or to tour with the GGD, no other musician was a permanent member, nor was any musician ever pictured as a band member, except Malinin, Rzeznik and Takac.

17. Any additional musicians employed by the GGD were hired as independent contractors, never participated in profits, never shared expenses, and never participated in the band's pension plan.

18. During the period when Malinin was a member of the GGD, the band grew from playing at small venues of generally less than 100 people to the considerable mainstream success it has today, playing to audiences numbering in the thousands.

19. Following the *Boy Named Goo* album, the GGD, with Malinin as drummer, released and toured such albums as *Dizzy Up The Girl*, *Gutterflower*, *Let Love In, Something For The Rest Of Us* and *Magnetic*. In 1998, the GGD were nominated for a Grammy for their song "Iris." In 2000, the band was nominated for another Grammy for their song "Black Balloon." In 2005, the band won Artist of the Year in the adult radio hit category at the Radio Music Awards. Indeed, the GGD's accolades during Malinin's tenure as a member of the band are too numerous to list herein.

20. While Malinin was the band's drummer, the band's value increased substantially. Malinin's contribution as one of the three band members for 19 years contributed to increasing the band's value, including growing the size and success of albums, air play and eventually the prominent mainstream success that the band enjoys today. Such goodwill created in part by Malinin's contributions to the GGD continues to this day, even after Malinin's wrongful separation from the band. What's more, Malinin's one third (1/3) monetary contribution to the expenses and the purchase of assets of the GGD represents an investment in the GGD which today is still being exploited by his bandmates without compensation to Malinin.

21. In or about Spring 2013, as the GGD were completing the recording of the *Magnetic* album and preparing to tour the album in the fall, Malinin and his wife received the happy news that she was pregnant with twins, their first children. The doctors estimated the due date to be December 30, 2013. Malinin shared the news with his GGD bandmates and, knowing this timing would occur during the tour, Malinin, Rzeznik and Takac agreed on a plan for Malinin to take paternity leave during the month of December 2013. The plan was for a replacement drummer to perform in Malinin's place at the December performances. As a band member, Malinin would continue to be paid his one third (1/3) percentage of the profits from the December shows and Malinin would pay his December replacement from his share of the profits from the December shows.

22. As planned, starting in early December 2013, Malinin left the tour to be with his wife for the birth of their twins. Malinin's wife gave birth on December 3, 2013 to twins: a boy and girl. Overjoyed and excited, Malinin immediately notified Rzeznik and Takac, *inter alia*, about the happy event.

23. The plan was that Malinin would rejoin the tour with the show at the Los Angeles House of Blues for New Year's Eve, 2013.

## MALININ'S TERMINATION FROM THE GGD AND SUBSEQUENT THREATS BY DEFENDANTS TO WITHHOLD ONGOING ROYALTY PAYMENTS

24. On December 27, 2013, just days before the New Year's Eve show, Malinin received a phone call from the GGD's manager, Pat Magnarella, informing him that he would not be performing at the New Year's Eve show, nor would he be permitted to perform at any further shows.

25. Malinin was shocked at the news and immediately asked Mr. Magnarella why he was being cut out of the GGD after 19 years. Mr. Magnarella declined to give any reason for the termination. Thereafter, Malinin made repeated

efforts to learn the reason why he was being precluded from performing with the GGD, including e-mails to Mr. Magnarella and Takac. For his only answer, the band's lawyers later wrote that Malinin was "terminated upon notice, without cause."

26. At all times, Malinin has been ready, willing and able to perform as the GGD's drummer at each and every performance of the current tour and, but for being prevented to do so by Defendants, would have so performed as he had for 19 years before.

27. Finding himself now without any income to support his family, and as a first-time father of three-week old twins, Malinin desperately called and wrote to the Defendants and the band's management, first requesting, then begging, for an appropriate severance package to compensate him for his contribution and interests in the venture that was the GGD's success. Malinin's pleas were met each time with a curt and direct "no".

28. Based upon their relationship with Malinin over his 19 years as the band's drummer, the Defendants and Malinin formed an equal and implied partnership, with all of the rights and duties of said partnership associated therewith. As a matter of California law, the Defendants could not dissociate Malinin from the GGD for no reason. Defendants' conduct, rendering it impossible for Malinin to perform and continue contributing to the GGD success, also breached certain fiduciary duties owed to Malinin as a band member, as well as breached the express partnership duties between Malinin and the Defendants, and each other, including: that he will be treated in good faith by other members of the partnership; that he will remain a member of the band as long as it continues to exist unless and until there is good cause under the law to dissociate Malinin from the partnership; and that no one will act unfairly, disloyally or maliciously in their dealings or deprive him of the security and benefit of his work and service to the band.

29. Malinin brings this action after considerable time and thought, balancing the burdens on him and his young family against the inhumanity of how he was treated by his long time colleagues, friends, bandmates and partners of 19 years. Clearly, his precipitous separation was for no reason whatsoever except spite and impetuous animosity, and clearly intended and timed to inflict as much harm as humanly possible on Malinin, a new first-time father of twins, his wife, and the two newborn twins who, at just three weeks old, are forced to bear the consequence of petty vengeance, cruelty and selfishness in their lives and the lives of those around them.

30. The manner, timing and consequences of the actions by Rzeznik and Takac demonstrate such clearly despicable conduct as to require that no justice can be done to make Malinin whole and teach the lessons of decency except to award not only just and fair compensatory and consequential damages, but also punitive damages and attorney fees.

## FIRST CAUSE OF ACTION
## WRONGFUL DISSOCIATION FROM THE PARTNERSHIP AGAINST ALL DEFENDANTS

31. Malinin incorporates by reference all previous allegations of this Complaint as though set forth in full herein.

32. Malinin, Rzeznik and Takac formed an implied equal partnership based upon their relationship, dealings, and course of conduct amongst themselves, and between the three bandmates and the outside world for the common purpose of building, growing and promoting the GGD.

33. At all times during Malinin's membership with the band and until he was wrongfully dissociated, the band functioned as a partnership of equals in recording music, touring to promote such music, marketing and merchandising the GGD, growing the band's brand identity and reputation and in the equal

distribution of the profit income and payment of working expenses associated therewith among the three partners. ("[Each] person who receives a share of the profits of a business is presumed to be a partner in the business . . ." Cal. Corp. Code § 16202(c)(3)). No formal written agreement is required to create the partnership.

34. As a member of the partnership, Malinin could only have been dissociated from the partnership for a reason specified in Cal. Corp. Code § 16601.

35. The Defendants wrongfully attempted to dissociate Malinin from the partnership without any cause whatsoever, in violation of Cal. Corp. Code § 16601. Because Defendants have no authority under the law to terminate Malinin, Malinin has continued to remain a partner in the partnership entitled to his share of profits and other net income.

36. The Defendants' actions preventing Malinin from performing with the band has made it impossible for Malinin to continue to contribute or participate in the partnership. Malinin is entitled to receive a fair and reasonable buyout from the GGD to compensate Malinin for his long service, loyalty, and commitment to the band, his lost expected compensation from an ongoing enterprise, the assets that the GGD acquired over the years and paid for, in part, from Malinin's share of revenues, and Malinin's contribution to the band's significant increase in its goodwill and value, all of which Malinin fairly and reasonably demands and expects, and payment for which is required by Cal. Corp. Code § 16701.

37. The Defendants unlawfully denied Malinin's requests for compensation and have kept the benefits of Malinin's work, kept Malinin's share of the profits from the remaining tour performances, his share of the band's assets, his contribution to the GGD's goodwill, his musical contributions, etc. to be exploited to their own gain without any payment to Malinin whatsoever.

38. As a direct, proximate, and foreseeable result of the Defendants' aforementioned breach of the implied partnership with Malinin, including, but not

- 10 -

COMPLAINT

limited to, Defendants' separation of Malinin without good cause and the Defendants' failure to pay Malinin his continuing partnership share of the remaining tour profits, and reasonable severance buyout sum, Malinin has been damaged in an amount to be determined at trial.

39. Defendants' alleged wrongful separation of Malinin from the partnership for no reason whatsoever is not only unsupported as a matter of law, but was timed to cause injury and oppression to Malinin, at age 46, just weeks after the birth of his twins, without any warning and without buyout as required by law. Such vindictive and despicable conduct was done with oppression, fraud, and/or malice as defined in Cal. Civ. Code § 3294(a), for which Malinin seeks exemplary and punitive damages and payment of his attorneys' fees. Cal. Corp. Code § 16701(i).

## SECOND CAUSE OF ACTION
## DETERMINATION OF BUYOUT PRICE OF MALININ'S PARTNERSHIP INTEREST IN THE GGD – AGAINST ALL DEFENDANTS

40. Malinin incorporates by reference all previous allegations of this Complaint as though set forth in full herein.

41. Malinin was wrongfully separated from the GGD and the partnership with the Defendants, thereby rendering it impossible for Malinin to continue to perform and contribute to the GGD.

42. Malinin is entitled to a buyout price from the partnership equal to the amount that would have been distributable to Malinin if the assets of the partnership, i.e., the GGD band, its brand and goodwill, etc., were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without Malinin and the partnership was wound up as

of the date of Malinin's ultimate dissociation, whenever so ordered by the Court, including interest.

43. Defendants have refused to pay Malinin for a buyout of his partnership interest, or any sum whatsoever.

44. Pursuant to Cal. Corp. Code § 16701(i), Malinin has the right to maintain an action against the Defendants for, *inter alia*, a determination of his buyout price and requests that this Court determine said buyout price and order payment be made to Malinin.

45. Because the Defendants acted arbitrarily, vexatiously, and not in good faith, Malinin is entitled to payment of his reasonable attorney's fees, including fees associated with any/all experts, appraisers, or auditors needed to determine the buyout price that Malinin is owed.

## THIRD CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTIES IN THE PARTNERSHIP AGAINST ALL DEFENDANTS

46. Malinin incorporates by reference all previous allegations of this Complaint as though set forth in full herein.

47. The Defendants' relationship with Malinin created an implied partnership between Rzeznik, Takac, and Malinin.

48. Because of the implied partnership, each partner owed the other partners fiduciary duties, including the duty of care, the duty of loyalty, the duty to exercise good faith and fair dealing with each other member, and the duty to treat each partner with respect and deference and to do nothing which would harm the partners or negligently affect the common enterprise, squander assets or opportunities, nor to seek advantage at the expense of either partner.

49. Malinin was wrongfully separated from the GGD when, without cause, Defendants precluded Malinin from performing and touring with the GGD or otherwise contributing to the partnership.

50. Malinin's wrongful separation occurred during a time that he was on paternity leave for the birth of his twins, during a time when he was caring for his wife and twins, and during a time when Malinin had no other source of income or security. Malinin's separation was without any cause, warning or payment. The Defendants knew all of these facts.

51. Defendants violated their fiduciary duties owed to Malinin as a partner by wrongfully dissociating him from the partnership for no reason whatsoever, by making it impossible for Malinin to continue to perform, tour or contribute, by failing to pay Malinin his continuing partnership percentage of the GGD profits, by failing to pay Malinin the buyout amount that he is owed as a partner and as required by statute, and by timing and effecting Malinin's dissociation without any cause, during a time when his wrongful dissociation would cause Malinin the most harm.

52. As a direct, proximate, and foreseeable result of Defendants' aforementioned conduct, Defendants breached their fiduciary duties owed to Malinin as a member of the partnership.

53. Because of said breach, Malinin has been damaged in an amount to be determined at trial.

54. Defendants' breach of their fiduciary duties owed to Malinin was done with oppression, fraud, and/or malice as defined in Cal. Civ. Code § 3294(a), thus entitling Malinin to exemplary and punitive damages and payment of his attorneys' fees.

## FOURTH CAUSE OF ACTION
## DECLARATORY JUDGMENT – ONGOING ROYALTIES
## AGAINST THE DEFENDANTS

55. Malinin incorporates by reference all previous allegations of this Complaint as though set forth in full herein.

56. An actual controversy has arisen and now exists between Malinin and the Defendants concerning their respective right and duties regarding Malinin's right to continue to receive royalties for albums on which Malinin played.

57. In an e-mail from Pat Magnarella, the GGD's manager, Mr. Magnarella stated that, absent the consent of the other two GGD members, Malinin's royalty payments would "end after the statement for this accounting period."

58. It is undisputed that Malinin has performed all necessary and required services in connection with each of the albums for which Malinin receives royalties so as to be entitled to continue to receive those royalties, in perpetuity.

59. A judicial determination is necessary and appropriate at this time to confirm Malinin's rights to continue receiving payment of his royalties.

60. The threats by the Defendants to terminate payment of Malinin's royalties is an anticipatory breach of the obligation to pay Malinin for which Malinin is entitled to receive his attorneys' fees expended to secure the benefits of his income expectation.

## **PRAYER**

**WHEREFORE**, Malinin prays for judgment against the Defendants, and each of them, as follows:

    (a)    For damages according to proof;

    (b)    For pre-judgment interest as permitted by law;

    (c)    For post-judgment interest as permitted by law;

    (d)    For punitive damages;

(e) For a judicial determination of Malinin's right to receive ongoing royalties for albums on which he performed in perpetuity;

(f) For a judicial determination of the buyout price to be paid to Malinin upon his dissociation from the partnership;

(g) For payment of Malinin's attorneys' fees; and

(h) For such other and further relief as the Court deems just and proper.

DATED: November 14, 2014    NOVAK, DRUCE, CONNOLLY BOVE + QUIGG

By:    /s/Curtis D. Porterfield
       CURTIS D. PORTERFIELD
       Attorney for Plaintiff Michael Malinin

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues asserted herein as may be triable to a jury.

DATED: November 14, 2014   NOVAK DRUCE CONNOLLY BOVE + QUIGG

By: _____/s/ Curtis D. Porterfield_____
CURTIS D. PORTERFIELD
Attorney for Plaintiff, Mike Malinin